IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ROBBI BEAUCHAMP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case. No: 3:22-cv-504-RAH |
| ) | [WO] |
| CATHY ANTEE, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This is an employment matter. Pending before the Court is the Defendants' *Motion for Summary Judgment*. (Doc. 33.) The Motion is fully briefed and thus ripe for decision. For the reasons set forth more fully below, the motion is due to be GRANTED.[1]

## FACTS

Robbi Beauchamp worked at Auburn University's College of Veterinary Medicine (CVM) from March of 2013 until her termination on March 12, 2021. At all times relevant to this lawsuit, Beauchamp worked as a Scholarship Advisor III in CVM's Office of Administrative Affairs (OAA), which was overseen by Defendant Melinda Camus, CVM's Associate Dean for Academic Affairs. As a Scholarship Advisor III, Beauchamp was involving in, among other activities, reviewing, editing, and approving portions of OAA's payroll.

---

[1] Beauchamp concedes summary judgment as to Counts I and II for age discrimination and retaliation, respectively. Accordingly, only Count V for a procedural due process violation will be addressed. Beauchamp also has abandoned her claims against Defendant Cathy Antee by not responding to Antee's argument that Beauchamp lacked standing to sue Antee—thus leaving Camus as the only remaining defendant.

1

In December of 2020, Jerri Turnbough was hired as an administrative assistant in the OAA. Because Turnbough was a temporary employee, her time card was reviewed and approved by Beauchamp. Camus also reviewed Turnbough's time card.

On March 1, 2021, Camus noticed several discrepancies in Turnbough's time card, including the following:

- February 16, 2021: Turnbough punched herself in at 7:56 a.m., and Beauchamp added a punch-out time of 4:45 p.m. to Turnbough's card. Camus knew however that Turnbough and Beauchamp left work early that day to receive a COVID-19 vaccination and that Turnbough did not return to work. (Doc. 33-3 at 39–40.)[2]

- February 19, 2021: Beauchamp added a punch-in time of 7:55 a.m. and a punch-out time of 3:30 p.m. to Turnbough's time card. (*Id.* at 40–41.) Camus knew however that Turnbough did not work that day because she was out sick. (*Id.* at 41; doc. 33-4 at 9.)

- February 26, 2021: Turnbough punched in at 7:53 a.m. and punched out at 11:42 a.m., and then Beauchamp added another punch-in time of 12:15 p.m. and a punch-out time of 4:45 p.m. to Turnbough's time card. Camus knew however that Turnbough did not work that afternoon due to a funeral. (Doc. 33-3 at 41–42.)

Because Camus (1) knew that Beauchamp approved Turnbough's time card and (2) saw from the CVM payroll system that Beauchamp had added hours to Turnbough's time card, she decided to meet with Beauchamp and Antee, CVM's Director of Administration, Business, and Finance, on March 1, 2021, to discuss the issue.

At the meeting, Beauchamp was given a copy of Turnbough's time card. Beauchamp acknowledged that she had inputted incorrect entries on Turnbough's time card. (Doc. 33-2 at 46, 53; Doc. 33-3 at 28.) According to Beauchamp, the

---

[2] For the sake of clarity, documents will be referred to by their page numbers based on their CM/ECF document page numbers.

2

inaccuracies were accidental. (Doc. 33-2 at 46.) Beauchamp was not told during the meeting that she was being investigated for falsifying time records, but nonetheless she felt that she had been accused of a "serious offense"—in her own words, "messing" with payroll. (*Id.* at 55.) Beauchamp was also informed that Nichole Diehl, a CVM Human Resources Manager, would be looking back through Beauchamp's payroll history to see if any other inaccuracies existed. (*Id.* at 53; Doc. 33-3 at 29.) Beauchamp was allowed to return to work.

Three days later Beauchamp was told to attend a "pre-termination meeting" with Camus and Diehl. (Doc. 33-2 at 55–56.) At this meeting, Beauchamp was accused of inputting incorrect times on Turnbough's time card and was given a portion of the Auburn employee misconduct policy, with Group 1 Offenses highlighted, which stated that "[c]hanging or otherwise falsifying or forging any University . . . time cards or time sheets" was a Group I Offense subject to immediate discharge. (Doc. 33-5 at 18, 55–56.) Beauchamp was also notified that the main campus of Auburn's human resources unit was going to investigate the issue and that she was being placed on administrative leave with pay, meaning that she was not to work or be on campus. (*Id.* at 55, 59.)

According to Beauchamp, she tried to defend herself by characterizing the entries as mistakes but felt as though Camus and Diehl were not listening as they frequently interrupted and redirected her. (*Id.* at 55.) Although Beauchamp believed that she did not have the opportunity to present her case in full, she left the meeting feeling as though she communicated to Camus and Diehl the same facts that she had previously told Camus and Antee at the March 1 meeting, and that there was nothing additional that she needed to say in her own defense. (*Id.* at 55, 57.) Beauchamp was also told that if there was anything else she wanted to communicate in her own defense she needed to tell Camus and Diehl at that meeting. (*Id.* at 56.)

On March 12, 2021, Beauchamp was terminated. The termination memo, (doc. 33-4 at 24–25), stated among other things that Beauchamp had entered incorrect hours on Turnbough's time card on multiple occasions, that these violations constituted the Group I offense of falsifying or forging Auburn records, and that accordingly, Beauchamp was being terminated effective March 15, 2021. Finally, the memo gave information regarding Auburn's grievance process. (*Id.* at 25.) Beauchamp however elected not to file a grievance. (Doc. 33-2 at 67.)

## STANDARD OF REVIEW

Summary judgment is appropriate where the materials in the record show there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its responsibility, the moving party must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (citation and internal quotation marks omitted).

To prevent summary judgment, a factual dispute must be both material and genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it has the potential of "affect[ing] the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Liberty Lobby*, 477 U.S. at 248). And to raise a "genuine" dispute of material fact sufficient to preclude summary judgment, "the nonmoving party must point to enough evidence that 'a reasonable juror could return a verdict'" in his favor. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). The "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 252.

4

**DISCUSSION**

Beauchamp argues that Camus violated her procedural due process rights when Camus terminated Beauchamp's employment with CVM without affording her an adequate pre-termination hearing. (Doc. 37 at 10–11.) Camus disputes this assertion, stating that Beauchamp received a constitutionally adequate pre-termination hearing and that, moreover, even if Beauchamp did not receive an adequate pre-termination hearing, Beauchamp's claim fails because Beauchamp did not pursue an available post-termination remedy.

"In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). *See also Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir. 1995) ("[T]o determine if a procedural due process violation occurred . . ., we must resolve: (1) whether [plaintiff] had a constitutionally protected property interest; (2) whether he was deprived of that interest; and (3) if he was deprived of a constitutionally protected interest, whether the [defendants] failed to use constitutionally sufficient procedures before that deprivation occurred." (citations omitted)).

The parties do not dispute the first or second elements of Beauchamp's procedural due process claim, but they do disagree about the third element. As such, the issue here is whether Beauchamp was afforded constitutionally sufficient process before her employment was terminated.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). Indeed, the Supreme Court has "described the root requirement

5

of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Id.* (citation and internal quotation marks omitted) (emphasis in original). In the public employment context, the "principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (citation and internal quotation marks omitted). *See also Reeves v. Thigpen*, 879 F. Supp. 1153, 1171 (M.D. Ala. 1995) ("In *Loudermill*, the Supreme Court made it clear that some form of pre-termination hearing is required before a public employee can be discharged, and consequently, deprived of his or her property interest in continued employment.").

The pre-termination hearing, though necessary, need not be elaborate. "[T]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Loudermill*, 470 U.S. at 545 (citation and internal quotation marks omitted). "In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* (citation omitted). Moreover, "the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46.

Accordingly, under *Loudermill*, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546. *See also Reeves*, 879 F. Supp. at 1171 ("Following the clear dictates of the *Loudermill* decision, . . . 'it is clear that oral notice and an opportunity to respond orally is sufficient in the pretermination context.'" (quoting *Kelly v. Smith*, 764 F.2d 1412, 1414 (11th Cir. 1985))). Moreover, "[t]he opportunity to present reasons, either in

6

person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Loudermill*, 470 U.S. at 546.

If a public employee receives *no* pre-termination hearing, then a due process violation is "complete" upon her termination—meaning that no post-deprivation remedy can cure the violation. *See Enter. Fire Fighter's Ass'n v. Watson*, 869 F. Supp. 1532, 1541 (M.D. Ala. 1994) ("[W]hen the violation of due process is the failure to provide a pretermination hearing, the violation cannot be cured subsequent to termination."). But if an *inadequate* pre-termination hearing was offered, a due process violation is not "complete" if a post-termination remedy can cure the deprivation. *See McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) ("When a state procedure is *inadequate*, no procedural due process right has been violated unless and until the state fails to remedy that inadequacy." (emphasis added)). *See also Galbreath v. Hale Cnty., Ala. Comm'n*, 754 F. App'x 820, 828 (11th Cir. 2018) ("Properly understood, *McKinney*'s holding that a state 'may cure a procedural deprivation by providing a later procedural remedy' is true only where post-deprivation procedures satisfy due process. But where a due process violation is already complete because no hearing was held as required by *Loudermill*, *McKinney* has no application." (citation omitted)). Importantly, "this rule is not an exhaustion requirement; instead, it recognizes that a procedural due process claim only exists if there are no *adequate* state remedies." *Hogan v. City of Fort Walton Beach*, No. 3:18-CV-1332-MCR-HTC, 2019 WL 11638968, at *3 (N.D. Fla. Mar. 29, 2019) (emphasis added), *aff'd*, 817 F. App'x 717 (11th Cir. 2020). *See also Cotton v. Jackson*, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000); *McKinney*, 20 F.3d at 1564 n.20.

Beauchamp argues that the process she received prior to her termination was inadequate because she "was not provided with any clear explanation of the charges of wrongful conduct being made against her," (doc. 37 at 7), and she was "not

7

permitted to speak freely" during the hearing, (*id.* at 6).[3]  Below, the Court discusses each prong of the *Loudermill* test to determine whether Beauchamp received an adequate pre-termination hearing.[4]

### A. Notice of Charges and Evidence

Beauchamp states that the extent of the notice of charges she received was "a copy of a page from the Employee Relations Job and Conduct Policy with the paragraph labeled 'Group 1' offenses highlighted." (*Id.* at 7.)  Specifically, Beauchamp asserts that all she knew was that she had been "charged with a serious offense," (*id.* at 11), but that she was not provided any details regarding the alleged violation.

Beauchamp's argument focuses only on the March 4 meeting and ignores the March 1 meeting.  But at the March 1 meeting, Beauchamp was presented with Turnbough's false time sheet entries,[5] she acknowledged that she had made a mistake

---

[3] Confusingly, and as the Defendants point out, (doc. 38 at 5), Beauchamp cites to law applicable when a public employee receives *no* pre-termination hearing—seemingly to suggest that an *inadequate* pre-termination hearing constitutes a "completed" procedural due process violation, (*see* doc. 37 at 10–11).  But Beauchamp received a pre-termination hearing, so her legal citations have little relevance.  Moreover, that Beauchamp received a constitutionally sufficient pre-termination hearing resolves any assertion Beauchamp makes that she received *no* pre-termination hearing.

[4] Because Beauchamp received adequate pre-termination process, the Court does not consider the issue of post-termination remedies.

[5] (*See* doc. 33-2 at 46 ("When I walked in, they had placed a copy of Jerri's time sheet—a copy of her time card in front of me. … Then that triggered me, and I said, 'Oh, yeah, this is not right. This has to be corrected[.]'"); doc. 33-5 at 98 ("I was called into a meeting . . . March 1 . . . and questioned about the entries on Jerri Turnbough's timecard. I immediately acknowledged . . . that the timecard was not correct.").)

8

on the time sheet,[6] and she was accused of committing a serious offense.[7] Moreover, Beauchamp's deposition shows that she knew that the March 4 meeting was a follow-up to the March 1 meeting.[8] Accordingly, Beauchamp clearly was on notice of the charges against her given the discussion at the March 1 meeting.

But even excluding the March 1 meeting, the information provided to Beauchamp at the March 4 meeting was itself sufficient to notify her of the charges against her. For example, Beauchamp said in her deposition that she was asked about the inaccuracies on Turnbough's time card, that she acknowledged she had entered the information on Turnbough's time card, and that she had tried to explain herself during the meeting. (Doc. 33-2 at 55.) She also acknowledged that the charge against her was communicated to her[9] and that the matter was going to be referred to "main campus for investigation," (*id.* at 56). Moreover, to the extent that Beauchamp argues that she was not given an opportunity to explain herself, it is difficult to envision how Beauchamp can simultaneously assert that she was not

---

[6] (*See* Doc. 33-2 at 53 ("What I did tell them was that those were incorrect, that I'm the one—Jerri didn't put them in. I put them in based on what [Jerri] told me but that I had time to correct them. That's what I did tell them.").)

[7] (*See id.* at 54–55 ("I would call them 'accusations' when I was asked, 'Did you do this?' And I was told 'Do you understand that this is a serious offense?' That's what I was told that day.").)

[8] (*See id.* at 55 ("I was told that based on . . . the accusations that were made about me and the time card, that they had deemed it necessary to send it to main campus HR for investigation. . . . And, you know, 'This is why we're sitting in here.' Then the notes that were taken on Monday[, March 1]. And Nicole Diehl, senior HR manager, was sitting by me. She was reading back through those notes.").)

[9] (*See* doc. 33-5 at 100 (stating that, after the March 4 meeting, she "picked up . . . the Employee Conduct and Progressive Discipline Policy that Nichole had highlighted the Group 1 paragraph on.").)

notified of the charges against her and yet was also "redirected" every time she tried to explain herself.  (*Id.* at 55).[10]

Given Beauchamp's repeated admissions that she was presented with the evidence against her and that she acknowledged the time card's inaccuracies and her role in editing the time card, Beauchamp received a sufficient explanation of her employer's evidence against her as required by *Loudermill*. *See Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989) (noting that "because [the plaintiff] admitted to the allegations, the basis for [the] questions [preceding the admission] became irrelevant.").

**B. Opportunity to Respond**

Beauchamp also argues that she was not given an opportunity to respond to the charges against her.  Once again, her assertions contradict her own deposition testimony.

For example, in her deposition, Beauchamp testified that during the March 1 and 4 meetings she acknowledged the inaccuracies on Turnbough's time card and stated to Camus, Antee, and Diehl that the inaccuracies were a result of her edits and a mistake.  To the extent Beauchamp asserts that she did not have an opportunity to be heard at the March 4 meeting, her argument seems to be less about whether she

---

[10] Beauchamp also makes glancing reference to the fact that her Termination Memo listed additional violations of the Employee Relations Job and Conduct Policy. (*See* doc. 37 at 9, 11–12.)  According to Beauchamp, the fact that her termination letter included additional alleged violations of which she had not been notified violated her procedural due process rights.  But Beauchamp cites no case law for this proposition, and it is not the Court's job to develop parties' arguments for them.  Indeed, the party opposing summary judgment "must spell out [her] arguments squarely and distinctly, or else forever hold [her] peace," as the Court "may ignore arguments not adequately developed by [the] nonmovant." *Ratcliff v. Heavy Machines, Inc.*, No. 06-0861-WS-M, 2007 WL 1791646, at *3 (S.D. Ala. June 20, 2007) (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999)).  "(T)he onus is upon the parties to formulate arguments[.]" *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc).  By quickly asserting this argument without citation to case law, Beauchamp fails to meet this burden.

had an opportunity to be heard and more about her frustration that she was not believed. After all, she was asked "repeatedly if there was anything else [she] 'needed' to tell them. [She] was told . . . that this was [her] only opportunity to speak for [her]self." (Doc. 33-5 at 99.) (*See also* doc. 33-2 at 56 ("I was told . . . 'Anything that you need to say, you need to say it now.'").)

But most crucially, Beauchamp also testified that, between her statements at the March 1 meeting and her statements at the March 4 meeting, *she did not have anything left to say*:

> Q. Did they tell you when th[e March 4] meeting was over that if you had any additional information to share with them, you could send it in an email?
>
> A. They did.
>
> Q. Did you do that?
>
> A. Absolutely not.
>
> Q. Okay. Why not?
>
> A. I told them everything that I could think to say in that meeting. I had had a meeting on Monday [3/1]. I had that meeting on Thursday. And I did not—I didn't see any benefit at that point of sending another email because everything that I needed to say had been said.

(Doc. 33-2 at 56.)

Simply put, Beauchamp's testimony shows that she was given ample opportunity to be heard. Beauchamp might not like the process she received or the outcome, but her displeasure with the process, especially the outcome, does not amount to a constitutional violation. Indeed, in being given notice of the charges against her, being presented with the evidence against her, and receiving an opportunity to respond to those charges and that evidence, Beauchamp received all

the process that she was due under the Constitution. *See Loudermill*, 470 U.S. at 546.

## CONCLUSION

Beauchamp was given notice of the charges against her, received ample opportunity to respond to the charges, and did so prior to her termination. As such, she received all the process she is due under the Constitution. That she disagrees with the outcome, or the fairness of the process, does not mean there has been a constitutional violation here. Summary judgment is due to be granted.

Accordingly, it is **ORDERED** as follows:

1. Defendant's *Motion for Summary Judgment* (doc. 33) as to Count V is **GRANTED**. Counts I and II are dismissed by concession of the Plaintiff.
2. As there are no further claims, a separate judgment will issue.

**DONE** this the 19th day of April, 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE